# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-20-00076-CV

**Brazos River Authority and The State of Texas, Appellants**

**v.**

**City of Houston; and Sylvester Turner, in his Official Capacity as Mayor of The City of Houston, Appellees**

### FROM THE 261ST DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-19-004189, THE HONORABLE KARIN CRUMP, JUDGE PRESIDING

## O P I N I O N

This is a dispute over the right to construct and operate a reservoir on Allens Creek. For over two decades, the City of Houston and the Brazos River Authority have jointly held a water-appropriation permit authorizing them to construct the reservoir and to use some of the water impounded there. In 2019, the Legislature instructed Houston to transfer its entire interest in the proposed reservoir, including its permit rights, to the Authority. *See* Act of May 16, 2019, 86th Leg., R.S., ch. 380, § 1, 2019 Tex. Gen. Laws 688, 688 (H.B. 2846). On cross-motions for summary judgment, the district court granted declaratory relief that H.B. 2846 is "unconstitutional, void, and unenforceable." We will affirm.

## BACKGROUND

To provide context to the parties' dispute, we begin with an overview of the relevant statutory framework, found in Chapter 11 of the Water Code. Under Chapter 11, the waters of Texas rivers, streams, and lakes are declared "the property of the state," *see* Tex. Water Code § 11.021(a), and "held in trust for the public," *see id.* § 11.0235(a). The right to use state water may be acquired by appropriation in the manner and for the purposes the chapter prescribes. *See id.* §§ 11.022, .023. No one may appropriate state water or "begin construction of any work designed for the storage, taking, or diversion of water" without a permit from the Texas Commission on Environmental Quality. *See id.* § 11.121. In processing a permit application, the Commission must comply with various procedural requirements, including providing notice to senior water rights holders and the opportunity for a hearing. *See id.* §§ 11.132, .133. The Commission may grant the application only after concluding, among other things, that the proposed appropriation "is intended for a beneficial use." *See id.* § 11.134(b)(3)(A). The permit may authorize an appropriation for a certain time or of permanent duration. *See id.* §§ 11.135–.138.

A permanent water right is conditioned on ongoing "beneficial use" of the appropriated water as set out in the permit. *See id.* § 11.135(a) ("The applicant's right to take and use water is limited to the extent and purposes stated in the permit."). The appropriative right is limited "not only to the amount specifically appropriated" in the permit, "but also to the amount which is being or can be beneficially used for the purposes specified in the appropriation, and all water not so used is considered not appropriated." *See id.* § 11.025. Similarly, no appropriative right is "perfected" until the water has been "beneficially used" for a purpose specified in the permit. *See id.* § 11.026. And because "[n]o person is granted the right to waste

2

water by not using it," *Lower Colo. River Auth. v. Texas Dep't of Water Res.*, 689 S.W.2d 873, 882 (Tex. 1984), an appropriative right is subject to forfeiture or cancelation for nonuse, *see* Tex. Water Code §§ 11.030, .146, .171–.177, .183–.186. "But such rights continue to exist in perpetuity to the extent beneficial use does." *Ware v. Texas Comm'n on Env't Quality*, No. 03-14-00416-CV, 2017 WL 875307, at *1 (Tex. App.—Austin Mar. 3, 2017, no pet.) (mem. op.). With this statutory framework in mind, we turn to the history of the case.

The site of the proposed reservoir is an approximately 9,500-acre tract located in Austin County near the confluence of Allens Creek and the Brazos River. In 1974, the Texas Water Commission (a predecessor of the Commission) granted Houston Power and Lighting Company's application for a permit to build a reservoir on the site. Water Appropriation Permit 2925 authorized HP&L to construct the reservoir and to use a certain amount of the water impounded there. The reservoir was never built, and the Commission canceled the permit at HP&L's request. HP&L retained ownership of the site subject to an option to purchase held by the Authority.

In 1999, the Legislature intervened to encourage development of a reservoir on the site. The Legislature designated the site "as a site of unique value for the construction of a dam and reservoir on Allens Creek" and found "that construction and development of the Allens Creek Reservoir project" would be "in the public interest and would constitute a beneficial use of the water." Act of May 22, 1999, 76th Leg., R.S., ch. 1291, § 1.01, 1999 Tex. Gen. Laws 4426, 4426 (S.B. 1593). To that end, S.B. 1593 granted the Texas Water Development Board (Board) "the right to construct a dam and reservoir on Allens Creek" and to "divert and use from the reservoir an amount of water specified" in a permit to be issued by the

Commission.  *Id.* § 1.02(a).  Instead of having the Board apply for a new permit, S.B. 1593 instructed the Commission to

> reissue without notice or hearing Water Appropriation Permit No. 2925 previously issued for the Allens Creek Reservoir.  The permit shall be issued in the name of the Texas Water Development Board and it shall have a priority date of September 1, 1999.  The date to commence construction of the reservoir shall be not later than September 1, 2018.  The [Commission[1]] may extend such time for beginning of construction for good cause.

*Id.* § 1.02(b).  To confirm the Commission's authority, S.B. 1593 amended Chapter 11 to authorize the Commission to reissue certain permits without notice or hearing.  *Id.* § 2.01 (codified at Tex. Water Code § 11.1311).[2]

The Commission reissued the permit—now called Permit 2925A—to the Board in February 2000.  Meanwhile, the Authority exercised its option to purchase the reservoir site.  The Authority paid $150,000 and received a deed to the site, subject to payment of the full purchase price.  To secure financing for the site and the reservoir itself, the Authority turned to Houston.  Houston and the Authority executed an interlocal agreement specifying their responsibilities.  As an initial step, they agreed to jointly apply to the Water Board for a $20,000,000 loan to finance purchase of the site, with Houston committing to pay 70% and the Authority 30%.  If the two were successful in obtaining the loan, the Authority agreed to convey to Houston a 70% interest in the site.  Next, they would jointly apply to the Commission to reissue the permit jointly to them.  Houston committed to pay 70% and the Authority 30% of the

---

[1]  S.B. 1593 names the Texas Natural Resource Conservation Commission, the predecessor of the Commission on Environmental Quality.

[2]  Section 11.1311, which was added by S.B. 1593, does not mention Permit 2925 by name but applies to "[a] permit for a reservoir project" that meets certain enumerated criteria.  *See* Tex. Water Code § 11.1311(a).  There is no suggestion that any other permit meets that criteria.

development and construction costs, with each party receiving a proportionate share of the water appropriated by the permit.

The Water Board granted the loan application the same year. The Authority recorded its deed to the site but did not convey any interest to Houston. The Commission subsequently issued an amended Permit 2925A jointly to Houston and the Authority.[3] The permit required that construction begin no later than September 1, 2018, and finish within three years. Failure to meet either deadline would cause the permit "to expire and become null and void" unless the Commission granted an extension.

However, construction could not start immediately. The permit required the holders to design the reservoir, undertake a habitat mitigation study in cooperation with the Texas Parks and Wildlife Department, and develop a plan to mitigate the environmental effects of the reservoir. The design would have to comply with standards laid out in the Commission's rules, and the plans would have to be submitted to the Executive Director of the Commission for approval "prior to beginning construction." In addition to these state-law requirements, federal law required the parties to obtain a permit pursuant to Section 404 of the Clean Water Act from the Army Corps of Engineers. Houston and the Authority executed a memorandum of understanding with the Texas Parks and Wildlife Department as an initial step towards meeting these requirements. The studies had not been completed as of the date of trial, and the two have not begun the process for acquiring the Section 404 permit. As the September 2018 deadline approached, Houston and the Authority requested an extension from the Legislature. In 2011, the Legislature agreed and directed the Commission to reissue the permit with a September 1,

---

[3] The Water Development Board also retained an interest in the permit.

2025 deadline to begin construction. *See* Act of May 19, 2011, 82d Leg., R.S., ch. 434, § 2, sec. 1.06, 2011 Tex. Gen. Laws 1104, 1104 (S.B. 1132). The Commission issued an amended permit—now called Permit 2925B—reflecting the new deadline.

The permittees made no further progress developing the reservoir by the time the Legislature held hearings on H.B. 2846 in 2019. Representatives of the Authority, Houston, and other interested entities testified. David Collingsworth, the Authority's general manager, testified that Houston was uninterested in funding the project because it did not need additional water. Collingsworth testified that the Authority, in contrast, needs additional water to meet the needs of its customers in the region. Carol Haddock, Houston's Director of Public Works, testified that Houston "did not necessarily fully appreciate the urgency of our partners" but was committed to the project. She estimated that Houston had spent approximately twenty-three million dollars on it to date. Other stakeholders testified in support of the bill and regarding the need for a reservoir in the area.

H.B. 2846 passed the Legislature and was signed into law. It amends S.B. 1593 to provide:

> Sec. 1.07. (a) Notwithstanding any other provision of this article, not later than January 1, 2020, the City of Houston shall enter into a contractual agreement with the Brazos River Authority to transfer to the Brazos River Authority all of the city's ownership interests in the Allens Creek Reservoir project, including all required water right permits, along with the responsibility to construct the project in accordance with all associated statutory requirements and deadlines.
>
> (b) Construction of the reservoir is subject to the Brazos River Authority obtaining all necessary federal permits.
>
> (c) In addition to other necessary provisions, the contractual agreement described by Subsection (a) must include provisions for the transfer of an amount not to exceed $23 million from the Brazos River Authority to the City of Houston.

H.B. 2846, § 1, sec. 1.07, 2019 Tex. Sess. Law Serv. at 688.

Shortly after H.B. 2846's effective date, the Authority sent Houston a proposed amendment to the Interlocal Agreement reflecting H.B. 2846's terms. Houston responded by suing the State and the Authority for declaratory relief that H.B. 2846 is invalid on multiple grounds. *See* Tex. Civ. Prac. & Rem. Code § 37.004(a) (authorizing suit for declaratory relief concerning validity of statutes). Houston filed a traditional motion for summary judgment, and the State and the Authority jointly filed a cross-motion for traditional summary judgment.[4] Houston separately filed objections to many of the exhibits attached to the cross-motion. The district court granted summary judgment to Houston and rendered declaratory relief that H.B. 2846 violates the Texas Constitution's prohibitions on retroactive laws, local or special laws, and the forced sale of government property. The district court further concluded that H.B. 2846 is unenforceable because it "violates [Sections 272.001 and 552.020] of the Local Government Code." Based on these declarations, the district court rendered judgment that H.B. 2846 "in its entirety is unconstitutional, void, and unenforceable." In a separate order, the district court sustained Houston's evidentiary objections in part and overruled them in part. The State and the Authority have appealed to this Court.

## EVIDENTIARY RULINGS

Before turning to the merits of the parties' cross-motions for summary judgment, we must determine what evidence is properly before us. The district court sustained Houston's objections to, as relevant here, the transcript of a hearing before the Committee on Natural

---

[4] The Authority also filed a third-party claim against Sylvester Turner, Mayor of the City of Houston, alleging that he acted ultra vires by refusing to execute the contract. The district court dismissed that claim for want of jurisdiction after concluding that H.B. 2846 is unconstitutional.

Resources of the Texas House of Representatives on H.B. 2826 and the 2016 Region H Water Plan (2016 Plan). Appellants invite us to take judicial notice of both exhibits. *See Office of Pub. Util. Counsel v. Public Util. Comm'n of Tex.*, 878 S.W.2d 598, 600 (Tex. 1994) ("A court of appeals has the power to take judicial notice for the first time on appeal."). We will grant their request.

A court may take judicial notice of "a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Tex. R. Evid. 201(b). Houston argues that we may not take judicial notice of the transcript because it contains speculation. Specifically, Houston argues that the witnesses and legislators speculated as to Houston's intentions regarding the project. Leaving aside the question of whether those individual statements have evidentiary value, the fact that stakeholders testified regarding the need for the proposed reservoir and their concerns about H.B. 2846 is a matter of legislative record and not subject to reasonable dispute. *See id.* We take judicial notice of the transcript and will incorporate it into our discussion of the merits of this appeal.[5] *See Zaatari v. City of Austin*, 615 S.W.3d 172, 187 (Tex. App.—Austin 2019, pet. denied) (taking judicial notice of hearing testimony and other legislative history pertaining to challenged municipal ordinance); *see also City of El Paso v. Fox*, 458 S.W.3d 66, 72 (Tex. App.—El Paso 2014, no pet.) (taking judicial notice of minutes of city council that were publicly available on council's website).

---

[5] We note that the district court overruled Houston's objections to transcripts of two other committee hearings on H.B. 2846, both of which contain similar testimony.

Houston does not address whether we may properly take judicial notice of the 2016 Plan. We take judicial notice of the 2016 Plan because it is a matter of public record and its accuracy is undisputed.[6] *See Office of Pub. Util. Counsel*, 878 S.W.2d at 600 (authorizing courts to take judicial notice of records on file with state agencies that are capable of accurate and ready determination and whose accuracy cannot reasonably be questioned); *see also MCI Sales & Serv., Inc. v. Hinton*, 329 S.W.3d 475, 485 n.7 (Tex. 2010) (taking judicial notice of report issued by federal agency).

## DISCUSSION

We now turn to whether the district court correctly granted summary judgment to Houston and declared that H.B. 2846 is void and unenforceable.

**Standard of Review**

Summary judgment is proper when there are no disputed issues of material fact and the movant is entitled to judgment as a matter of law. *See* Tex. R. Civ. P. 166a(c); *AEP Tex. Cent. Co. v. Arredondo*, 612 S.W.3d 289, 293 (Tex. 2020). We review an order granting summary judgment de novo, "taking as true all evidence favorable to the nonmovant and indulging every reasonable inference in the nonmovant's favor." *AEP Tex.*, 612 S.W.3d at 293. When both parties move for summary judgment on the same issue, "we consider the evidence presented by both parties and determine all questions presented," rendering the judgment the trial

---

[6] Every five years, the Water Board adopts a state water plan incorporating regional water plans submitted by planning groups in different parts of the state. *See* Tex. Water Code §§ 16.051(a), .053. Region H is the planning area that includes Houston and the proposed Allens Creek Reservoir. The 2016 Plan details the anticipated uses of water from all sources in the region, including the proposed Allens Creek Reservoir. It also describes the regulatory steps that must be completed before construction can begin.

9

court should have rendered. *See Bush v. Lone Oak Club, LLC*, 601 S.W.3d 639, 646–47 (Tex. 2020).

A question of statutory construction is a legal one, which we also review de novo. *Id.* Our goal in construing a statute is to ascertain and give effect to the Legislature's intent, looking first to the "plain and common meaning of the statute's words." *Id.* (citing *MCI Sales & Serv., Inc. v. Hinton*, 329 S.W.3d 475, 500 (Tex. 2010)). In discerning a statute's plain and common meaning, we "consider the context and framework of the entire statute and construe it as a whole." *Aleman v. Texas Med. Bd.*, 573 S.W.3d 796, 802 (Tex. 2019) (citing *Cadena Comercial USA Corp. v. Texas Alcoholic Beverage Comm'n*, 518 S.W.3d 318, 326 (Tex. 2017)).

**Statutory Claims**

We begin with the district court's conclusion that H.B. 2846 is invalid because it "violates [sections 272.001 and 552.020] of the Local Government Code."[7] *See* Tex. Loc. Gov't Code §§ 272.001(a) (requiring any "political subdivision of the state" to provide notice before transferring land unless enumerated exception applies), 552.020 (regulating water supply contracts between water districts and municipalities). Appellants argue that the district court erred because there is no conflict or, if one exists, H.B. 2846 controls. Houston responds that H.B. 2846 is invalid in that it requires Houston to execute a contract that violates sections 272.001 and 552.020 of the Local Government Code. We agree with appellants.

Houston's argument is essentially that H.B. 2846 is invalid because it modifies sections 272.001 and 552.020. But the "Legislature's power to amend or repeal an earlier statute

---

[7] We address this ground for summary judgment first because it does not require us to decide whether H.B. 2846 is constitutional. *See In re B.L.D.*, 113 S.W.3d 340, 349 (Tex. 2003) ("As a rule, we only decide constitutional questions when we cannot resolve issues on nonconstitutional grounds.").

is generally limited only by federal or state constitutional provisions or federal law." *Graphic Packaging Corp. v. Hegar*, 538 S.W.3d 89, 104 (Tex. 2017). "When statutes irreconcilably conflict, traditional rules of statutory construction dictate that the later enacted and more specific legislation should control." *Id.* at 98. H.B. 2846 requires a single municipality to execute a contract with the Authority that contains specified terms. By contrast, Section 272.001 requires any "political subdivision of the state" to provide notice before transferring land unless an exception applies, Tex. Loc. Gov't Code § 272.001(a), and Section 552.020 applies generally to water–supply contracts between municipalities and water districts, *id.* § 552.020. These requirements first appeared in 1987. *See* Act of May 15, 1987, 70th Leg., R.S., ch. 149, § 1, 1987 Tex. Gen. Laws 707, 1055–56, 1243–44. Assuming that a conflict exists, H.B. 2846 controls because it is the later-enacted and more specific provision. *See Hegar*, 538 S.W.3d at 98 ("As the later-enacted, more specific statute, section 171.106 prevails."); *Jackson v. State Off. of Admin. Hearings*, 351 S.W.3d 290, 297 (Tex. 2011) (holding later-enacted and more specific statute controlled). The district court erred by overturning H.B. 2846 based on its conclusion that the legislation violates sections 272.001 and 552.020 of the Local Government Code.[8]

---

[8] Houston also argues that the district court found that H.B. 2846 "also violates the Texas Local Government Code through [the Authority's] Enabling Act." The Authority's enabling act is codified in the Special District Local Laws Code, not the Local Government Code. *See generally* Tex. Spec. Dist. Code §§ 8502.001–.020. But even if we were to assume that the district court's declaration also encompasses this statute, we would still reject Houston's argument. Houston argues that H.B. 2846 violates a provision authorizing the Authority to "execute contracts with municipalities in the state substantially in the manner prescribed by Section 552.020, Local Government Code[.]" *See id.* § 8502.006(c). H.B. 2846—which is more recent and pertains to a single contract—would prevail over that provision of the Authority's Enabling Act. *See Graphic Packaging Corp. v. Hegar*, 538 S.W.3d 89, 98 (Tex. 2017) ("When statutes irreconcilably conflict, traditional rules of statutory construction dictate that the later enacted and more specific legislation should control.").

11

**Constitutional Challenges**

In considering Houston's constitutional challenges to H.B. 2846, we begin with a presumption that the statute is valid. *See In re Commitment of Fisher*, 164 S.W.3d 637, 645 (Tex. 2005) ("An analysis of the constitutionality of a statute begins with a presumption of validity."). We start with Houston's claim that H.B. 2846 is unconstitutionally retroactive because it is dispositive.

The Texas Constitution prohibits the creation of retroactive laws. *See* Tex. Const. art. I, § 16 ("No bill of attainder, ex post facto law, retroactive law, or any law impairing the obligation of contracts, shall be made."). "A retroactive law is one that extends to matters that occurred in the past." *Tenet Hosps. Ltd. v. Rivera*, 445 S.W.3d 698, 707 (Tex. 2014); *see also Union Carbide Corp. v. Synatzske*, 438 S.W.3d 39, 55 (Tex. 2014) ("We have defined a retroactive law as 'a law that acts on things which are past.'" (quoting *Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 219 (Tex. 2002))). Appellants both argue that H.B. 2846 is not retroactive but present different arguments in support of their respective contentions.

The Authority argues that nothing in H.B. 2846 defeats the presumption that statutes apply prospectively. Although the Authority is correct that courts "generally presume that statutes are prospective unless they are expressly made retroactive," *City of Austin v. Whittington*, 384 S.W.3d 766, 790 (Tex. 2012), no specific language is required to defeat this presumption. Instead, courts construe the statutory text to determine the Legislature's intent. *See In re M.C.C.*, 187 S.W.3d 383, 384 (Tex. 2006) (per curiam) (explaining that statutes are "applied retroactively if the statutory language indicates that the Legislature intended that the statute be retroactive"). Construing H.B. 2846 as a whole, we agree that it has retroactive effect.

12

As we explain in greater detail below, the Commission's grant of Permit 2925B conveyed a constitutionally protected property interest, which H.B. 2846 eliminated. *See Texas Water Rights Comm'n v. Wright*, 464 S.W.2d 642, 648 (Tex. 1971) (holding statute authorizing forfeiture of water rights after period of nonuse applied retroactively because of its "definite impact on rights created before the effective date of the statute"); *Zaatari*, 615 S.W.3d at 188 (holding municipal ordinance banning short-term rentals retroactive because it "operates to eliminate well-established and settled property rights that existed before the ordinance's adoption"); *see also Robinson v. Crown Cork & Seal Co.*, 335 S.W.3d 126, 139 (Tex. 2010) (noting that "[m]ost statutes operate to change existing conditions" (citing *Wright*, 464 S.W.2d at 648)).

The State argues that H.B. 2846 does not change the "legal significance of actions Houston took in the past." To the extent the State means that a law is only retroactive if it changes the effect of past conduct, we disagree. The Texas Constitution's ban on retroactive laws is a "general prohibition" on applying laws to "matters which have occurred in the past[.]" *Id.* at 138. Thus, whether H.B. 2846 is retroactive does not turn on whether it changes the consequences of Houston's past "actions."[9]

---

[9] We observe that the State relies on a case—*Ramirez v. State*, 184 S.W.3d 392, 395 (Tex. App.—Dallas 2006, no pet.)—applying the constitutional prohibition on ex post facto laws. *See* Tex. Const. art. I, § 16 ("No bill of attainder, ex post facto law, retroactive law, or any law impairing the obligation of contracts, shall be made."). The prohibition on ex post facto laws concerns legislation imposing punishment for past acts. *Rodriguez v. State*, 93 S.W.3d 60, 67 (Tex. Crim. App. 2002) ("[T]he mark of an ex post facto law is the imposition of what can fairly be designated punishment for past acts." (citing *De Veau v. Braisted*, 363 U.S. 144, 160 (1960))). Because H.B. 2846 is not a criminal statute, the ex post facto provision does not apply here. *See Barshop v. Medina Cnty. Underground Water Conservation Dist.*, 925 S.W.2d 618, 633 (Tex. 1996) ("It is well established that the prohibition against ex post facto laws applies only to retroactive criminal or penal laws.").

13

Next, the State argues that H.B. 2846 is not unconstitutionally retroactive because Houston's right in the permit, if any, is not "vested." Traditionally, courts concluded a law was unconstitutionally retroactive if it "takes away or impairs vested rights[.]" *Subaru of Am.*, 84 S.W.3d at 219 (citing *Ex parte Abell*, 613 S.W.2d 255, 260 (Tex. 1981); *McCain v. Yost*, 284 S.W.2d 898, 900 (Tex. 1955)). But as the State acknowledges elsewhere in its brief, the supreme court expressly rejected this test, explaining that "[w]hat constitutes an impairment of vested rights is too much in the eye of the beholder to serve as a test for unconstitutional retroactivity." *Robinson*, 335 S.W.3d at 143. Instead, courts consider three factors in light of the prohibition's dual objectives of "protect[ing] the people's reasonable, settled expectations"—i.e., that "the rules should not change after the game has been played," and "protect[ing] against abuses of legislative power." *See id.* at 138 (citing *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265–66 (1994)). Those factors are: (1) "the nature and strength of the public interest served by the statute as evidenced by the Legislature's factual findings;" (2) "the nature of the prior right impaired by the statute;" and (3) "the extent of the impairment." *Id.* at 145. This test acknowledges the heavy presumption against retroactive laws by requiring a compelling public interest to overcome the presumption. *Tenet Hosps.*, 445 S.W.3d at 707. But it also appropriately encompasses the notion that "statutes are not to be set aside lightly." *Id.* (citing *Robinson*, 335 S.W.3d at 146).

We first consider whether H.B. 2846 serves a compelling public interest "as evidenced by the Legislature's factual findings." *See Robinson*, 335 S.W.3d at 145. Houston argues that the absence of findings is "fatal" to the statute's constitutionality. However, the Court in *Robinson* considered the entire legislative record and additional related information, *see id.*, and we have done the same in subsequent cases, *see Zaatari*, 615 S.W.3d at 189 (considering

14

legislative record and other pertinent information when applying *Robinson* test); *Texas Educ. Agency v. American YouthWorks, Inc.*, 496 S.W.3d 244, 264 n.111 (Tex. App.—Austin 2016), *aff'd sub nom. Honors Acad., Inc. v. Texas Educ. Agency*, 555 S.W.3d 54 (Tex. 2018) (same). Considering the legislative record and the other pertinent evidence in the record, we conclude that the public interest served by H.B. 2846 is slight.

Appellants argue that H.B. 2846 is in the public interest because it is necessary to discharge the Legislature's constitutional duty to conserve the State's natural resources. *See* Tex. Const. art. XVI, § 59(a) ("The conservation and development of all of the natural resources of this State . . . [is] hereby declared [a] public right[ ] and dut[y]; and the Legislature shall pass all such laws as may be appropriate thereto."). They argue that the record demonstrates that the Legislature reasonably determined that Houston should be removed from the project and that we should defer to that determination as in the public interest.

We agree that constructing the reservoir is in the public interest. In addition to the findings in S.B. 1593, the legislative record of H.B. 2846 demonstrates the need for a reservoir in the region.[10] We also agree that the record demonstrates that the Legislature acted out of concern for the delays in developing and constructing the proposed reservoir. *Cf. Robinson*, 335 S.W.3d at 150 (noting that it "[a]ccept[s] the legislative record as indicating the reasons for [the Legislature's] actions"). However, nothing in the record supports a conclusion that H.B. 2846 resolves these concerns.

---

[10] For example, Brazoria County Judge Matt Sebasta testified that the inability to obtain "firm water" resources threatens the county's population growth. Tony Bennet, President of the Texas Association of Manufacturers, testified that the availability of affordable water rights is crucial to the region's economy. A representative of Dow Chemical agreed, adding that his company twice decided against expanding in the region because of the scarcity of reliable water access.

15

Permit 2925B provides that failure to begin construction by September 1, 2025, renders the permit null and void. To reach that point, the Authority must first obtain a variety of regulatory authorizations. According to the 2016 Plan, these include:

- obtaining a permit under Section 404 of the Clean Water Act,

- obtaining a National Environmental Policy Act Environmental Impact Statement,

- completing a Cultural Resources Survey and National Register of Historic Places testing,

- developing a plan to mitigate the impact of the reservoir on the waters and wetlands of the United States, and

- completing ancillary studies required by the United States Fish and Wildlife Service and the Texas Parks and Wildlife Department to determine the presence of endangered species on the site and to assess the impact of the project.

The 2016 Plan estimates a "10-year schedule" to complete these steps and an additional two-and-a-half- to three-and-a-half year allowance to design and construct the reservoir itself. David Collingsworth, the Authority's general manager and CEO, told the Legislature in 2019 that the permitting process would begin "in the next twelve months" and be complete within "5-7 years," followed by three years of construction. In all, he estimated that "we are looking at a 10-year project here if, if all the stars align and everything goes right."

But even if Houston had transferred its interest to the Authority by the January 1, 2020, deadline, and the Authority had started the process immediately, less than five years would have remained until the September 1, 2025 deadline to begin construction. Neither appellant suggests that H.B. 2846's statement that construction is subject to the Authority obtaining "all necessary federal permits" modifies that deadline, and we do not interpret it that

way. When the Legislature passed S.B. 1132 to extend the construction deadline, it did so in express terms:

> Time Limitation No. 7.a. in Permit No. 2925A issued by the Texas Natural Resource Conservation Commission, the predecessor agency to the Texas Commission on Environmental Quality, to the Texas Water Development Board is amended to require that construction of the Allens Creek Reservoir commence on or before September 1, 2025, and be completed not later than the fifth anniversary of the date construction of the reservoir commences.

S.B. 1132, § 1, sec. 1.06 (a), 2011 Tex. Gen. Laws at 1104. If the Legislature intended in H.B. 2846 to extend the deadline, it could easily have done so. *See Zanchi v. Lane*, 408 S.W.3d 373, 380 (Tex. 2013) (noting that if the Legislature had intended service-of-citation rules to apply to service of expert reports in suits over health care liability claims, it "knew how to do so").

The permit would not expire if the Authority timely applied for an extension and the Commission subsequently granted one. However, an extension is not available as of right under the Commission's rules. The Commission "may grant" an extension if the permit holder explains why construction "could not be commenced or completed within the time required" and demonstrates they acted with "reasonable diligence" to begin or complete construction on time. *See* 30 Tex. Admin. Code § 295.72(b) (Texas Comm'n on Envt'l Quality, Applications for Extension of Time). The parties did not utilize this procedure in 2011 but rather sought an extension from the Legislature. At oral argument, the Authority agreed that it will likely need to return to the Legislature for an extension of the construction deadline.

Given the likelihood that Permit 2925B will expire unless the Legislature or the Commission takes further action, H.B. 2846 itself does little to advance construction of the reservoir. Appellants disagree, arguing that H.B. 2846 is necessary because the reservoir will

17

never be built if Houston is involved. Houston responds that the record does not support this view, attributing much of the delay to litigation over the Authority's application for a separate permit to appropriate additional water from the proposed reservoir. Houston and the Authority reached a settlement in 2014 where they agreed to begin developing the reservoir after the Authority's new permit became final and unappealable, which occurred four years later.[11] Setting aside whether the record supports either characterization of Houston's involvement, the fact that removing Houston from the project has a rational relation to constructing the Allens Creek Reservoir does not automatically render H.B. 2846 constitutional. *See Maple Run at Austin Mun. Util. Dist. v. Monaghan*, 931 S.W.2d 941, 947 (Tex. 1996) (rejecting argument that "any law having a conservation purpose" necessarily does not violate constitutional prohibition on local or special laws); *see also Robinson*, 335 S.W.3d at 145 (reiterating that retroactive legislation is not exempt "from the constitutional prohibition merely because there was a rational basis for its enactment, or even because, on balance, it is likely to do more good than harm"). The Legislature made no findings to justify H.B. 2846, and, based on the record before us, we conclude the public interest served is slight. *Compare Tenet Hosps.*, 445 S.W.3d at 707 (holding that retroactive provision of legislation that "was a comprehensive overhaul of Texas medical malpractice law" served compelling public interest), *and Synatzske*, 438 S.W.3d at 58 (holding that retroactive legislation aimed at resolving asbestos-related litigation crisis and supported by legislative fact findings served compelling public interest), *with Robinson*, 335 S.W.3d at 143–44 (holding that retroactive legislation ostensibly enacted for sole benefit of one entity and not supported by legislative fact findings did not serve compelling public interest).

---

[11] We discuss this dispute in more detail in our consideration of the second *Robinson* factor.

18

Even if we were to conclude that H.B. 2846 serves a compelling interest, our consideration of the remaining *Robinson* factors—which require us to balance the purpose against the nature of the prior right and the extent to which the statute impairs that right—would still result in our conclusion that the statute is unconstitutionally retroactive. *See Robinson*, 335 S.W.3d at 147–48. Regarding the nature of the prior right, we consider the extent to which the impaired right was "settled." *Id.* at 142–43, 147, 149.

The dissent argues that we should begin by analyzing whether Houston's permit right is vested. In the dissent's view, *Robinson* did not "vitiate the need to evaluate whether the prior right is vested" but rather taught that a showing of vested rights is not always required. *Post* at ___. Surveying decades of case law, the dissent argues that the prohibition on retroactive legislation "broadly protects rights" of individual and private entities—even if those rights are not vested—but protects a narrower class of rights held by municipal corporations and other political subdivisions. *Id.* at ___. The dissent "conclude[s] that when a municipal corporation asserts a prior right against the State to challenge a retroactive law as unconstitutional, the municipal corporation generally needs to demonstrate that the nature of its prior right against the State is a vested property right as a threshold requirement to trigger the *Robinson*" balancing test. *Id.* at ___.

We read *Robinson* differently. Generally, before any constitutional rights attach, a litigant must possess a "liberty or property interest that is entitled to constitutional protection." *Klumb v. Houston Mun. Emps. Pension Sys.*, 458 S.W.3d 1, 15 (Tex. 2015). A constitutionally protected interest "must be a vested right, which is 'something more than a mere expectancy based upon an anticipated continuance of an existing law.'" *Id.* (quoting *City of Dallas v. Trammell*, 101 S.W.2d 1009, 1014 (Tex. 1937)). The term "vested right" had a "special

19

meaning" in the retroactivity context prior to *Robinson*, 335 S.W.3d at 140. Surveying its precedents applying the impairs-vested-rights test, the supreme court observed that "there are vested rights and then there are vested rights, and not all laws which may fairly be said to retroactively impair vested rights are constitutionally prohibited." *Id.* at 142. In the court's estimation:

> The dispute over whether to call something a vested right appears driven not so much by what the words mean as by the consequence of applying the label—that its impairment is prohibited. Or as one commentator has put it: "it has long been recognized that the term 'vested right' is conclusory—a right is vested when it has been so far perfected that it cannot be taken away by statute."

*Id.* at 143 (internal footnote omitted). The supreme court therefore discarded the impairs-vested-rights test in favor of the balancing test. *See id.* ("What constitutes an impairment of vested rights is too much in the eye of the beholder to serve as a test for unconstitutional retroactivity."); *In re Occidental Chem. Corp.*, 561 S.W.3d 146, 161 (Tex. 2018) (orig. proceeding) (explaining that *Robinson* "expressly rejected the vested-rights test"). While *Robinson* discarded the "special meaning" the term "vested" had taken on in retroactivity jurisprudence, it preserved the requirement that litigants possess an interest that is vested in the sense that is "more than a mere expectancy based upon an anticipated continuance of an existing law." *See, e.g., Honors Acad.*, 555 S.W.3d at 61. Every litigant who challenges a law as unconstitutionally retroactive must possess an interest that is "vested" in this sense. *See id.* at 61–69 (evaluating, for purposes of due process and retroactivity claims, whether charter school operator's interest in charter rose to that level).

To support its argument that that municipalities must possess an interest that is vested in the sense rejected in *Robinson*, the dissent turns to the general rule that "Municipal

20

Corporations do not acquire vested rights against the State" but that the "Legislature cannot by retroactive legislation applicable to municipal corporations destroy or impair vested rights which persons have acquired in their relationships with the municipal corporations." *Deacon v. City of Euless*, 405 S.W.2d 59, 62 (Tex. 1966). In *Milam County v. Bateman*—which addressed counties as political subdivisions of the State—the supreme court stated that:

> [T]he political rights and privileges delegated to counties are not within the constitutional prohibitions against retroactive laws and those which impair vested rights. A different principle, however, obtains as regards the rights of counties to property which they may acquire. Such rights, as a general rule, are protected by the same constitutional guarantees which shield the property of individuals.

54 Tex. 153, 165–66 (Tex. 1880); *see also Texas Antiquities Comm. v. Dallas Cnty. Cmty. Coll. Dist.*, 554 S.W.2d 924, 930 (Tex. 1977) (plurality op.) (applying *Milam County*); *Love v. City of Dallas*, 40 S.W.2d 20, 27 (Tex. 1931) (holding that even though school district had no vested right to continue operating, "the public that it represents has a vested right in the municipal property acquired for its benefit"). The dissent would proceed to determine whether Houston's permit rights are "property" within the meaning of these decisions. We respectfully decline to do so because neither appellant argues that Houston's status as a municipal corporation affected the nature of its right. And we are not required to address it because the rule announced in these cases does not necessarily implicate standing. *See Wilson v. Andrews*, 10 S.W.3d 663, 669 (Tex. 1999) (repudiating dicta in *Proctor v. Andrews*, 972 S.W.2d 729, 734 (Tex. 1998), which had agreed with court of appeals that city lacked standing to raise due process and equal protection challenges because municipalities do not enjoy due process rights); *Stop the Ordinances Please v. City of New Braunfels*, 306 S.W.3d 919, 929 (Tex. App.—Austin 2010, no pet.) (noting that "plaintiff is not required to allege the deprivation of a 'vested right' constituting a due-process

21

violation to demonstrate the requisite infringement of a 'legally protected interest'").[12]  Instead, we evaluate the case as it has been presented to us by the parties.

We now turn to determining Houston's interest.[13]  Constitutionally protected property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law[.]"  *Honors Acad.*, 555 S.W.3d at 61 (citing *Board of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)). Appellants argue that the supreme court has already settled this issue by holding that no one has protected rights in unused water rights.  *E.g.*, *Wright*, 464 S.W.2d at 648 (explaining permittees were not "vested with the right of non-use of the water").  In this view, a water-appropriation permit is no more than a right to acquire water rights in the future through use.  We disagree.

First, the text of Permit 2925B clearly contemplates a lengthy process of development and construction before use of the appropriated water.  In addition to the federal regulatory requirements, the permit requires the holders to submit to the Commission a federally

---

[12]  The dissent argues that we must perform this analysis because *Robinson* directs a reviewing court to consider the nature of the prior right, and the Authority and Houston both challenge whether Houston's permit rights are entitled to protection.  We agree that we must determine whether the prior right is entitled to protection, but we are not required to fashion an argument on a party's behalf.  *See In re Thompson*, 330 S.W.3d 411, 424 (Tex. App.—Austin 2010, orig. proceeding) (explaining that "it is not court's duty to 'fashion a legal argument . . . when [party] has failed to do so' and that it is inappropriate for appellate court to 'speculate as to what [party] may have intended to raise'" (quoting *Canton-Carter v. Baylor Coll. of Med.*, 271 S.W.3d 928, 931 (Tex. App.—Houston [14th Dist.] 2008, no pet.))).  We therefore decline to address whether Houston's status as a municipality affects whether its prior right is enforceable.  *Cf. Wilson v. Andrews*, 10 S.W.3d 663, 669 (Tex. 1999) (explaining city had standing to assert due process claim and choosing to "assume without deciding that government entities can raise due process and equal protection challenges and confront the merits of its constitutional challenges.").

[13]  To avoid confusion, we will refrain from using the term "vested" any further in determining the nature of Houston's prior right.  *See Zaatari v. City of Austin*, 615 S.W.3d 172, 190 (Tex. App.—Austin 2019, pet. denied) ("Regarding the nature of the prior right, we consider not whether the impaired right was 'vested,' but the extent to which that right was 'settled.'").

22

approved plan to mitigate the environmental effects, design the reservoir and obtain the Commission's approval of the designs, and obtain the Commission's approval of conservation and drought contingency for the facility.

Second, Chapter 11 does not support appellants' view of a water-appropriation permit. Although there is no doubt that "[n]o person is granted the right to waste water by not using it," *Lower Colo. River Auth.*, 689 S.W.2d at 882, Chapter 11 contemplates that using some water rights will require permit holders to construct the necessary facilities. The statute sets default deadlines to begin construction, *see* Tex. Water Code § 11.145, and authorizes cancellation of a permit if the permittee fails to begin construction on time, *see id.* § 11.146.[14] The Commission may issue temporary permits reallocating water rights while the development process is ongoing unless "the issuance of the permit will jeopardize financial commitments made for water projects that have been built or that are being built to optimally develop the water resources of the area." *See id.* § 11.1381(b). Additionally, the statute exempts from cancelation for nonuse permits that were "obtained as the result of the construction of a reservoir funded, in whole or in part, by the holder of the permit." *See id.* § 11.173(b)(4); 30 Tex. Admin. Code § 297.71(b)(6) (2021) (Texas Comm'n on Env't Quality, Cancelation in Whole or in Part).

These provisions apply fully to Permit 2925B despite the unique way it was issued. Section 11.1311 provides that a permit issued pursuant to that section—which Permit 2925B was—"shall be administered in accordance with this chapter and as otherwise provided by law." Tex. Water Code § 11.1311(c). Construed as a whole, Chapter 11 clearly indicates that a permit such as Houston's is more than a mere expectation that the permit holder will one day

---

[14] Section 11.146 does not apply to a permit to construct a reservoir that, like the Allens Creek proposal, can hold more than 50,000 acre-feet of water. *See* Tex. Water Code § 11.146(g).

23

acquire protected rights. *See Honors Acad.*, 555 S.W.3d at 61 ("To have a constitutionally protected property interest, a person must have a 'legitimate claim of entitlement' rather than a mere 'unilateral expectation.'" (quoting *Roth*, 408 U.S. at 577)); *see also American YouthWorks*, 496 S.W.3d at 260 (explaining that "[s]ome substantive limit on the State's discretion" to revoke benefit "is an essential characteristic of a property interest warranting constitutional protection" (citing *Grounds v. Tolar Indep. Sch. Dist.*, 856 S.W.2d 417, 418 (Tex. 1993)).[15]

*Wright* and the supreme court's other cases involving property rights in water permits do not alter our conclusion. *Wright* involved a challenge to a statute authorizing cancelation of a water permit after ten years of nonuse. 464 S.W.2d at 642. The supreme court agreed that the statute was retroactive because it impacted rights that existed before the statute's effective date. *Id.* at 648. Rejecting the permit holders' arguments that their permits did not require them to use the water, the court explained that a permit "by definition" conveys "only the right to use the water for beneficial purposes." *Id.* at 647. "Inherently attached to a permit to appropriate waters, therefore, is the duty that the appropriator will beneficially use the water." *Id.* at 648. Thus, the permittees could reasonably expect enforcement of conditions inherently attached to their permits, and the permits themselves carried no right to be forever free of a remedy to enforce those conditions. *Id.*

---

[15] Houston argues that the effect of these provisions is that Houston is entitled to retain its permit until it expires unless the Commission cancels it through the procedure laid out in Chapter 11. Appellants respond that Chapter 11 "makes no difference" to Houston's claim because the Legislature is not bound by its own statutes. We agree with appellants to the extent that Chapter 11 does not prevent the Legislature from acting to cancel Houston's permit outside the context of Chapter 11. *See Hegar*, 538 S.W.3d at 104 ("[A]s a general rule, one 'legislature cannot prevent future legislatures from amending or repealing a statute.'" (quoting *Central Power & Light Co. v. Public Util. Comm'n of Tex.*, 649 S.W.2d 287, 289 (Tex. 1983))). But Chapter 11 is not irrelevant—it shapes the contours of Houston's property interest.

24

The supreme court later rejected a retroactivity challenge to the Edwards Aquifer Act for similar reasons. *See Barshop v. Medina Cnty. Underground Water Conservation Dist.*, 925 S.W.2d 618, 633–34 (Tex. 1996). Before the Act, withdrawal of groundwater from the aquifer was unrestricted. *Id.* at 624. The Act created an Authority to regulate groundwater withdrawals and, among other things, capped annual withdrawals and restricted withdrawals under a permit based on the owner's historic use. *Id.* The court upheld the Act despite its retroactive effect because the landowners could have no settled expectation "that a limited resource like groundwater, affected by public and private interests, will not require allocation[.]" *See Robinson*, 335 S.W.3d at 145 (discussing *Barshop*, 925 S.W.2d at 633–34).

Houston's interest in Permit 2925B is more settled. Unlike the property owners in *Barshop*, Houston is relying on a permit allocating it a specific amount of water. And unlike the permits at issue in *Wright*, Houston's permit contemplates a period of nonuse of the appropriated water. Houston could reasonably expect to rely on the terms of the permit. Appellants disagree, arguing that Houston could have no settled expectations in a permit it had not used and had refused to fund for two decades. However, the record shows that Houston could reasonably expect that the development process would not begin until 2018. In 2002—two years after the Commission reissued the permit jointly to the parties—the Authority filed with the Commission a separate application for a "System Operations Permit." This application requested numerous authorizations, including a new appropriation of 400,000 acre-feet of state water. The new appropriation included additional water from the proposed Allens Creek Reservoir. Securing that portion of the appropriation required Houston's approval. Houston refused and was among several parties who contested the application in an administrative proceeding. Houston and the Authority executed a settlement agreement in 2014 calling for Houston to withdraw its contest in

25

return for a share of the additional appropriation. The Settlement Agreement further provided that "[a]fter the Authority obtains a final and non-appealable Permit, Houston and the Authority shall enter into one or more subsequent Agreements . . . to provide for the implementation in detail of the terms generally contemplated by this Agreement" and the Interlocal Agreement, including "the development and design, construction, operation, and maintenance" of the proposed reservoir. The Commission issued System Operations Permit No. 5851 to the Authority in 2016, but it did not become final and unappealable until 2018. The record contains no evidence that the negotiations called for in the settlement agreement took place.

In sum, the terms of the permit, the governing statutory provisions, and the surrounding circumstances all contribute to a reasonable, settled expectation that Houston will retain its interest in Permit 2925B at least until September 1, 2025. Based on the record before us, we conclude that Houston's property interest in Permit 2925B is "settled."

We now turn to the third *Robinson* factor, which directs us to consider the extent of H.B. 2846's impairment of the settled rights. *See Robinson*, 335 S.W.3d at 145. Appellants concede that H.B. 2846 eliminates Houston's 70% interest in the project but argue that the impairment is "minimal" because Houston has no need for the water for the next fifty years. Houston disagrees and cites Haddock's affidavit regarding the role Houston's rights in Permit 2925B played in the City's long-term water plans. Notwithstanding Houston's relative need for the water, a water right is valuable in other ways beyond its immediate usefulness. A permanent water right is an easement that passes with title to the land and may be conveyed as with other rights in land. *See* Tex. Water Code § 11.040; *Ware*, 2017 WL 875307, at *1. Haddock testified that Houston's interest in the project constitutes 15% of its total surface water rights and that Houston relied on the existence of this interest in its long-term water planning. H.B. 2846

26

undeniably eliminates Houston's 70% interest in the project. The elimination of a right plainly has a significant impact on that right.[16] *See Robinson*, 335 S.W.3d at 148.

Because the record shows that H.B. 2846 serves a minimal public interest while having a significant impact on Houston's well-settled property right, we hold that H.B. 2846 is unconstitutionally retroactive. *See id.* at 150. Consequently, the district court did not err in granting summary judgment to Houston on this ground. Having concluded that H.B. 2846 is unconstitutionally retroactive, we need not address Houston's remaining constitutional challenges to that statute. *See* Tex. R. App. P. 47.1.

## CONCLUSION

We affirm the district court's judgment.

_____
Edward Smith, Justice

Before Justices Goodwin, Triana, and Smith
  Dissenting Opinion by Justice Goodwin

Affirmed

Filed: June 30, 2021

---

[16] Although H.B. 2846 eliminates Houston's interest in the project, the impact on Houston's obligation to repay the remainder of the loan from the Water Board to purchase the reservoir site is less clear. Executive Administrator of the Water Board Jeff Walker testified during the hearings in 2019 that Houston had paid eleven million dollars out of its fourteen-million-dollar share of the loan.